### Burgan v. Pittsburgh, Appellant.

Argued March 25, 1953.   Before Stern, C. J.,
Stearne, Jones, Chidsey, Musmanno and Arnold, JJ.

*James G. Legnard,* Assistant City Solicitor, with
him *Anne X. Alpern,* City Solicitor, for appellant.

*John E. Evans, Jr.,* with him *Evans, Ivory & Evans,*
for appellee.

Opinion by Mr. Justice Musmanno, May 25, 1953:
On March 11, 1949, Harry P. Burgan, 70 years of
age, while crossing Liberty Avenue in the City of Pitts-
burgh, was struck by one of the defendant city's motor-
cycles, which, travelling at the rate of 40 miles per
hour, dragged him 400 feet, inflicting near-fatal injuries.
In the ensuing lawsuit against the City of Pittsburgh,
the jury returned a verdict in favor of the plaintiff in
the sum of $25,000.   Upon defendant's motion for a
new trial, asserting excessiveness in the verdict, the
court below refused a new trial but reduced the amount
of the verdict to $19,227.22.   Judgment having been
entered in that sum, an appeal was lodged in this Court.

The only question before us is whether the amount
of the verdict should be further reduced.   Dr. J. Huber
Wagner, distinguished and veteran surgeon, testified at
the trial that when the plaintiff arrived at the hospital,
serious doubt was entertained as to whether he would
survive the severe shock he had sustained. Dr. Wagner
described the plaintiff's more extensive and serious in-

juries as follows: (1) Tear or wound of the right side of the face which involved the right eyelid, leaving the eyeball exposed; (2) Fracture of the nose; (3) Severe laceration, or tear, of the inner side of the right arm; (4) Fracture of the upper third of the right tibia; (5) Open or compound fractures of the mid part of both the right tibia and fibula, with both bones (tibia and fibula) protruding from the skin, and with the fibula broken into five or six pieces; (6) Right elbow broken down, requiring a skin graft. An ulcer developed at the point of the graft and further operations were required; (7) Skin on the right leg severely lacerated requiring extensive skin graft; (8) Contusion in the right shoulder causing that area to become frozen; (9) Dirt imbedded in plaintiff's face and palms of both hands; (10) Loss of upper denture and unnumbered lower teeth.

The plaintiff underwent seven operations and received numerous blood transfusions. The operation on the right leg required the insertion of a bone screw and the application of a cast. Although a good union was developed at the site of the fracture, a crooked leg resulted. This deformity will be permanent.

The operation involving the face was described by the doctor: ". . . pigment, ashes, dirt, or what not, was ground into the skin. This was cut. It was torn up here . . . A piece of skin was taken from his forearm and put in his eye. You can see the dirt in his face was not completely removed. His condition didn't permit that." These facial injuries and surgical repair produced a permanent facial disfigurement.

The plaintiff was away from work for 11 months, sustaining a loss of earnings in the sum of $1980. He returned to his regular employment for the period from February 5, 1950 to April 30, 1951, when he was retired because of his age. The defendant contends that since the plaintiff earned as good wages after the accident as

before the accident, he should not be considered to have suffered a compensatory disability. But this argument excludes the possibility that had Burgan not been injured, he could have earned even more than he did and could have continued to earn a livelihood for a longer period of time. In *Young v. Pooley Furniture,* 83 Pa. Superior Ct. 434, 437, the Court said: "In Yeager v. Anthracite Brewing Company, 259 Pa. 123, the plaintiff received the same wages per week after the accident as before and for that reason it was claimed there would be no loss of earning power or capacity. It was held p. 128, citing McLaughlin v. Corry, 77 Pa. 109, 'the earnings of the plaintiff, subsequent to the injury, are, as compared with his earnings prior to the injury, evidence, but not conclusive, as to whether his earning power has been diminished by reason of the injury resulting from the accident. . . . . . The fact that he was receiving at the time of the trial the same wage he had received previous to his injury was no assurance that in the future he would receive the same wage for similar employment, or that his injured condition would not compel him to accept a much smaller remuneration for labor which he could perform.' "

The standard of remunerative capacity in any given case is not that of the average person but that of the particular individual involved. Otherwise, a wounded Hercules with his vast muscular potentialities would not be entitled to any more compensation for a serious disablement than an injured Lilliputian.

The evidence shows that Burgan had a strong physique. It was testified that at the end of each day's work, he was capable of doing still "another day's work." Dr. Wagner testified: "I never knew him before, I don't know his vitality, but he evidently was a man of very good vitality or he wouldn't have recovered."

While the age of the plaintiff is rather advanced, there is no indication that he does not have many useful

years of life ahead, all of which he was entitled to freely enjoy without the dragging chains of deformity and disfigurement. The plaintiff's crooked right leg and the permanent disfigurement resulting from skin grafting and imbedded dirt will remain for him a constant source of embarrassment and humiliation. In *Studebaker v. Pittsburgh Railways Co.*, 260 Pa. 79, this Court said: "While the trial judge in the case at bar did not use the term 'mental suffering,' yet it is familiar law that where such suffering is the result of physical injury it may be considered on the question of damages. In an action for negligence there can be no recovery for mental suffering except it be founded upon physical injury, but where such suffering is the direct and necessary consequence of the physical injury the jury may consider it . . . we believe the rule as above stated is sound and applies to cases of mutilation and disfigurement, whenever the mental suffering is the natural and necessary result of the physical injury."

It is not disputed here that the plaintiff's crippled leg and his mutilated countenance are the "natural and necessary" results of the physical injuries inflicted upon the plaintiff by the defendant's negligence, and therefore were properly considered by the jury in assessing damages.

The severe cuts, fractures and excoriations suffered at the time of the accident, plus the long hospitalization (16 weeks) with its scraping and cutting of bone, the slicing, removing and transplanting of skin, and the manipulation of frozen joints all subjected the plaintiff to an enormous amount of pain. He testified: ". . . they shackled my hands down on each side of the bed that I couldn't move, and I laid there night after night. I was kind of cold . . . I couldn't even pull the covers up." Splints were fastened from the wrist to the shoulder of each arm. The cast from hip to foot remained for many

months. After discharge from the hospital the plaintiff for 6 or 7 months could only move about on crutches.

While our decisions have declared that compensation for pain and suffering is "such amount as will be the most reasonable approximation the circumstances admit to a pecuniary compensation not in the nature of things capable of exact measurement,"[1] this does not mean that pain and suffering are indifferent items in the calculation of a just verdict.

Pain and suffering are substantive losses and, for the same reason that a person is entitled to retain, against the encroachment of others, the full and unimpeded use of his limbs, organs and other parts of his body, so is he equally guaranteed freedom from physical and sensory torment. Pain and suffering, while existing, can be as much a disability as crippling, rupture or dismemberment. It is the jury's duty to appraise the pain and the agony of an anatomy in discord and to affix monetarily the responsibility of the person or legal entity which broke nature's harmony. It is apparent here that the jury recognized in the plaintiff's distortion and disfigurement a grave invasion of his rights as an able-bodied man and a deprivation of vital resources which are every healthy man's heritage and natural wealth.

The Trial Judge saw and heard the plaintiff, he also weighed the testimony of the other witnesses. He was in a much better position than we are to determine the reasonableness of the verdict: *Herb v. Hallowell*, 304 Pa. 128. His reduction of that verdict to $19,227.22 represents his judicial and conscientious appraisement of the losses suffered by the plaintiff. Considering the entire record, we do not find that the amount shocks our sense of justice, nor does the action of the lower court in allowing the verdict, as reduced to stand, show any

[1] *Schenkel v. Traction Co.*, 194 Pa. 182.

impropriety or abuse of discretion on its part: *Quigley v. Penna. R.R. Co.*, 210 Pa. 162. The judgment is accordingly

Affirmed.