365 A.2d 1271
**Robert M. HAVENS**
v.
**John TONNER, et al. Appellant.**

Superior Court of Pennsylvania.
Nov. 22, 1976.

---

372

John M. Wolford, MacDonald, Illig, Jones & Britton, Erie, for appellant.

Frank L. Kroto, Jr., Will J. Schaaf, Erie, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge.

This case arises on appeal by defendant Tonner from a judgment against him for $170,000 in an action of trespass arising from a motor vehicle collision.

The accident occurred December 12, 1969, on interstate highway I–90 just southeast of Erie at a time when the highway was icy and partially snow covered. The right lane of the highway was partially obstructed by a light truck which had gone out of control earlier in the day and ended up disabled and at right angles to the highway, blocking most of the right lane.[1] Appellant, operating a tractor-trailer unit heavily laden with steel sheet, was driving in the left-hand lane some distance behind appellee. Appellee, driving in the right-hand lane, testified that as he approached the obstruction he signaled his move into the left-hand lane with his turning light, but appellant testified that he saw no signal. Appellant was driving at a faster rate than appellee and was unable to brake or decelerate sufficiently as appellee's auto pulled into the lane in front of him. As a consequence, appellant's truck struck appellee's car from the rear just after it had passed the disabled vehicle. The injuries to the appellee, which are the basis of this litigation, resulted.

1. The owner and driver of the disabled vehicle were added by appellant as additional defendants, but were exonerated from liability by the jury.

Appellee was 38 years old at the time of the accident, employed by Jones and Laughlin Steel Corporation as a salesman in the Erie territory at a salary of $900 a month plus limited bonuses.

Appellee sustained a moderate to severe whiplash and a weakness in the right arm and leg which developed after the whiplash. He was hospitalized for ten days and then convalesced at home over the remainder of the Christmas holidays. Thereafter he went back to work. For the first two or three weeks his wife drove his car for him, but thereafter he was on his own. He continued in this employment until June 11, 1973, some three and one-half years after the accident, driving his own car a normal mileage of about 2,000 miles a month and working full time. He did this under some difficulty because of the impediment of a cervical collar which he wore because of the whiplash and a weakness in the right arm and leg which developed as a consequence of the accident.

On June 11, 1973, his employment was terminated because of a reorganization of sales territory, unrelated to any physical disability of appellee. Appellee's supervisor testified that inasmuch as appellee's territory involved only one large account the decision was reached that it could be handled by a product manager or from the central office without employing a salesman. The decision was not influenced by appellee's physical condition, most of which was not even known to the supervisor.

It is as of this date of termination that appellee claims total and permanent disability. Appellee was earning $1,065 per month at the time of termination.

Between the time of the accident and the trial, a period of nearly five years, appellee's family doctor had him examined by several neurosurgeons and the Cleveland Clinic. These doctors have given appellee many tests, including the myelogram on several occasions, in an effort

to locate the source of his difficulty. All tests have been negative.

Unrelated to the accident, the appellee suffers from diabetes, arthritis, gout and weight problems.

The liability of appellant and the nonliability of his co-defendants have been established by jury verdict and are not at issue on appeal. The appeal is addressed to the issue of damages and, specifically, to the testimony of an economist who was permitted to testify to a calculation made by him of appellee's lost earnings based upon the premise of total and permanent disability over an estimated normal work life of 20.69 years, projected forward from the date of trial. This work life expectancy was calculated from work life tables published by the Bureau of Labor Statistics of the Department of Labor. The economist started his calculation on the assumption that had appellee continued as an employee of Jones and Laughlin he would have been earning at an annual rate of $12,780 at the time of trial, to which he added various fringe benefits incident to that employment and, finally, a cumulative annual increment of 3½% which he characterized as a "productivity factor".

The result of these calculations was that the loss of future earnings would amount to $426,510 and that these lost earnings had a present value of $261,291 under the Pennsylvania 6% rule. The witness added $16,926 for bonuses that might have been earned between the date of the accident and the time of trial had appellee made more sales. The end result was a damage estimate of $278,217. Using the assumption of the Pennsylvania rule that this money could be invested at 6%, the result would be an annual income of $16,693 with the principal left intact.

The admissibility of this testimony is challenged on two grounds: (1) that there was no basis for the assumption that the appellee suffered a total and perma-

nent disability; and (2) that there was no justification for adding and compounding a 3½% increment as a "productivity factor."

*Total and permanent disability.* The evidence relied upon to support a finding of total and permanent disability is found in the testimony of appellee's family doctor who testified on direct examination that in his opinion appellee was not employable in any labor market at the present time. When the adequacy of this statement was challenged as a basis for the economist's assumption of total and permanent disability, the doctor was recalled and asked whether appellee's disabilities, which the questioner characterized as total and permanent, were the direct result of the trauma which appellee suffered in the accident. The doctor accepted the assumption of the question and replied that the accident was the cause of his present condition and caused his disability.[2] The doctor identified the injuries to which he was referring as the neck injury and weakness in the right arm and leg.

On cross examination, the doctor testified that full disability began when he lost his job on June 11, 1973. He explained this conclusion on the basis of his experience as medical advisor for two companies in Erie which he said would not even consider hiring a man in appellee's condition, "not the way industry is set up now a days".

There was no testimony that appellee was incapable of performing all the physical and mental functions necessary to full time employment as a salesman or that his condition was any different following termination of his employment three and a half years after the accident than it had been before termination. The medical testimony was to the effect that appellee's condition resulting from the accident had apparently stabilized, neither im-

2.  Transcript of testimony, pp. 451A and 452A. The doctor neither earlier or at this time ever testified that appellee was totally and permanently disabled.

proving nor worsening. The testimony from which total and permanent disability is assumed rests on the conclusion of a doctor that a man with a neck problem resulting from a whiplash and a weakened right arm and leg was unemployable in the industrial market as presently set up. This was treated by the doctor as the equivalent of a total and permanent disability and so accepted by the trial court.

We cannot agree. Being industrially unemployable because of medium to large industry's current reluctance to hire employees with medical problems does not equate with either total or permanent disability. The fact that appellee continued in his job as a steel salesman for three and one-half years after the accident demonstrates that there is a difference. Nor does industry, such as Jones and Laughlin or the doctor's two client industrial firms, constitute the sole employment market. Appellee's experience as a salesman would be relevant in any labor market where sales skill is a factor. Appellee's only effort to find employment after his termination by Jones and Laughlin was a single application on which he declined to follow through because it involved a physical examination. The fact that the family doctor, who characterized appellee as unemployable by industry as he knew it, accepted this circumstance as the equivalent of total and permanent disability is a legal conclusion rather than medical evidence and one that we cannot accept.

It follows that the economist who calculated projected future loss of earnings should not have been permitted to make that calculation on the assumption of total and permanent disability without evidence of physical or medical disabilities which would prevent appellee from continuing work as a salesman or in some related capacity for which he was qualified.

*The "productivity factor".* Nor can we accept the 3½% productivity factor which was built into the

calculation of lost future earnings. It was based upon
nothing but the economist's assertion that experience
demonstrated that industrial productivity increased an-
nually by at least that much due to improved technology
and that this improvement was normally passed along in
the form of increased wages. No foundation for these
assertions was offered, although data on the subject is
doubtless calculated by the Bureau of Labor Statistics of
the Department of Labor. Indeed, the entire topic of in-
creased productivity came into the testimony after the
witness was instructed by the court to make his calcula-
tion without including a wage inflation factor which he
had originally used.

Steadily rising wage rates over the next twenty years,
whatever the cause, are simply one face of the coin of in-
flation. It may be that inflation will become so much an
established pattern of our economy that it should be rec-
ognized in estimating loss of future earnings. Certainly
the erratic behavior of the economy over the past half
dozen years, plagued by war and other unusual circum-
stances, is not a sufficient demonstration that inflation
at any predictable rate will continue for another twenty
years. Furthermore, even if inflation is a part of the
pattern of the future, one certain consequence is that in-
terest rates on money will reflect that fact. Consequent-
ly, a sum representing the present worth of future earn-
ings will earn more in dollars in an inflationary period
than would otherwise be the case. This may not wholly
compensate for the effect of inflation but it is a closer
and more certain approximation than any assumption of
a certain rate of inflation over the next twenty years.
We view the "productivity factor" as simply a substitute
for inflation and equally speculative and inadmissible in
a calculation of future earnings.

The appropriateness of including an inflation factor in
a calculation of loss of future earnings, expressed in
terms of an annual increase in all wage rates because of

assumed escalating economic conditions, appears to be a matter of first impression in the appellate courts of this Commonwealth.

However, disapproval of such a practice was suggested in *Hargrove v. Frommeyer & Co.*, 229 Pa.Super. 298, 313, 323 A.2d 300, where this court stated that it would be disposed to find error in the use of an inflationary increment had it not been for a charge to the jury which presumably corrected any misconception arising from the testimony.

The United States Circuit Court of Appeals for the Third Circuit, in each instance sitting as a Pennsylvania court, has three times ruled that the use of an inflationary factor expressed in terms of an assumed general increase in wages is improper: *Hoffman v. Sterling Drug*, 3 Cir., 485 F.2d 132, 142–144; *Magill v. Westinghouse Electric Corporation*, 3 Cir., 464 F.2d 294, 299–300, and *Frankel v. Heym*, 3 Cir., 466 F.2d 1226, 1229, affirming D.C., 321 F.Supp. 1331.

In *Hoffman*, an economist testified that the plaintiff, an architectural draftsman, could be expected to receive a 6% annual salary increase over a work life expectancy of 26 years. This was said to be the rate of increase for architectural draftsmen in the New York area over the previous five years. The court held that such a factor projected into the future over a long period of time was mere speculation and inadmissible.

In *Magill*, an annual earnings increase factor of 3½% based upon economic trends was held to be error in absence of evidence that the plaintiff, on his own merits and record, would probably have received certain promotions or pay raises.

In *Frankel*, a 5¼% increase in the cost of institutional care was projected forward over a fifty year period on the basis of cost increases actually experienced over a ten

year period. In rejecting such a factor, the court said 321 F.Supp. 1331, 1346—

"The projected inflationary trend is speculation. Plaintiff has used the decade of the 1960's, one of the more inflationary times in the history of our country, as the basis for a projection of over fifty years. It is common knowledge that our Government is and has been attempting to control inflation, even to the point of considering wage and price controls. Economists differ on their predictions. Moreover, plaintiff will have money that can be invested and if inflation continues, the return on the money will be greater, and this would have an offsetting effect."

These rulings of the Third Circuit Court of Appeals, while not binding upon us, are instructive and we find their reasoning convincing. Any estimate of future earnings over a substantial period of years based upon economic predictions is necessarily extremely speculative in nature. Much more satisfactory is evidence of the earning potential of the individual in question. As stated in *Burgan v. Pittsburgh,* 373 Pa. 608, 611, 96 A.2d 889, 890—

"The standard of remunerative capacity in any given case is not that of the average person but that of the particular individual involved. Otherwise, a wounded Hercules with his vast muscular potentialities would not be entitled to any more compensation for a serious disablement than an injured Lilliputian."

We must, therefore, reverse the judgment of the court below because of the inadmissible assumptions of the economist who testified to the future earning potential of the appellee. However, there is no occasion to retry the issue of liability which has been determined by the jury and has not been contested on appeal. We, therefore, reverse the judgment solely on the issue of damages.

The judgment of the court below is reversed on the issue of damages and the case remanded for a new trial limited to that issue.

SPAETH, J., files a dissenting opinion in which HOFFMAN and PRICE, JJ., join.

SPAETH, Judge (dissenting).

I disagree with the majority's holdings with respect to the admissibility or sufficiency of the evidence on appellee's permanent and total disability, and also with respect to the use of a "productivity factor" in calculating appellee's lost future earnings.

## I

Since I am not sure whether the majority holds appellee's evidence of permanent and total disability (1) inadmissible, (2) insufficient as a basis for the economist's calculations, or (3) insufficient to prove a prima facie case or to support the verdict, I shall discuss each in turn.

## (1)

The majority states that "the fact that the family doctor, who characterized appellee as unemployable by industry as he knew it, accepted this circumstance as the equivalent of total and permanent disability is a legal conclusion rather than medical evidence and one that we cannot accept." Majority opinion 243 Pa.Super. at 377, at 1274.

The law is clear that a medical doctor, when properly qualified, may offer his opinion that a plaintiff is permanently and totally disabled, and as a result will never be able to secure gainful employment. *Cooper v. Metropolitan Life Insurance Co.*, 323 Pa. 295, 186 A. 125 (1936); *Palmer v. Warren State Railway Co.*, 206 Pa. 574, 56 A. 49 (1903); *Woodford v. Equitable Life Assurance Socie-*

*ty*, 149 Pa.Super. 225, 27 A.2d 411 (1942); *Harmon v. Knoll*, 129 Pa.Super. 390, 195 A. 448 (1938).[1]

## (2)

The majority states that appellee's family doctor never "testified that appellee was totally and permanently disabled." Majority opinion 243 Pa.Super. at 376, at 1273, note 2. From this the majority seems to hold inadequate the foundation laid for a hypothetical question posed to the economist, in which he was asked to estimate appellee's lost future earnings on the assumption of permanent and total disability.

The family doctor's testimony included the following:

Q. Do you have an opinion within a reasonable degree of certainty, Doctor, based on all of this, within your medical knowledge, as to whether his present condition will improve?

A. From what I have seen of him from the way he is going medically, I don't see how he can, he has certainly not improved and I don't anticipate his improvement.
(R. 201a.)

Q. When did he get this full disability?

A. I would feel when he was fired in that and can I say why I feel this?

Q. Yes, because I'm going to ask you about it?

A. I base this on employment physicals that I do for other companies, for other patients that I have, that I see in the office who are trying to get jobs.

As far as I am concerned, on the companies that I do physicals for, we would not hire him. We

1. These are old cases, it is true; and one might observe that more sophisticated and informative means of proof are now available—for example, testimony by vocational counselors or industrial employment specialists. That observation, however, does not affect the admissibility of a doctor's testimony as to disability and employability.

wouldn't even consider him. Other patients that I see who have disabilities, I also can't get them jobs. We have sent them to re-hab, we have sent them to therapy, we have just been unsuccessful in getting these people back to work. No one wants to hire them even to the point that I have had people doing telephoning answering jobs at their homes and they have been poor.

(R. 461a.)

Like much oral testimony this is not as clearly said as it might have been; but I think it beyond dispute that the jury could reasonably infer from it that the doctor had concluded that appellee would never be able to secure or to perform work. That possible inference is all that is required as a foundation for a hypothetical question. "[A] party may state specifically the particular facts he believes to be shown by evidence *or such facts as the jury would be warranted in finding from the evidence,* and ask the opinion of the expert on such facts, assuming them to be true." *Gillman v. Media,* 224 Pa. 267, 274, 73 A. 342, 344 (1909) (emphasis added).

### (3)

The majority states:

The testimony from which total and permanent disability is assumed rests on the conclusion of a doctor that a man with a neck problem resulting from a whiplash and a weakened right arm and leg was unemployable in the industrial market as presently set up. This was treated by the doctor as the equivalent of a total and permanent disability and so accepted by the trial court.

We cannot agree.

Majority opinion 243 Pa.Super. at 377, at 1273.

First, it is incorrect to say that the *court* accepted the testimony as the equivalent of permanent and total dis-

ability. The court was not the fact-finder; once it had decided that the evidence offered was sufficient to get the question to the jury, it became the jury's decision whether appellee was indeed permanently and totally disabled.[2] Second, if the majority means that the evidence was not sufficient to get the question to the jury, I disagree. "A plaintiff's evidence is sufficient to go to a jury when the facts, whether based on direct or circumstantial evidence, are such that a reasonable jury could conclude that liability should rest with the defendant." *Cox v. Equitable Gas Co.*, 227 Pa.Super. 153, 155, 324 A. 2d 516, 517 (1974). Nor could I agree that the jury's verdict was against the weight of the evidence. While appellant offered a fair amount of evidence tending to show a lack of objectively measurable disability, that evidence did not, in my view, clearly outweigh appellee's evidence, which was substantial. "Substantial evidence has been defined as meaning such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Erie-Lackawanna Railroad Co. v. Pennsylvania P. U. C.*, 205 Pa.Super. 291, 294, 208 A.2d 908, 910 (1965). Furthermore, the jury heard and saw appellee and could draw their own conclusions as to whether they believed him when he described the seriousness of his disability. Finally, appellant offered no evidence to prove that appellee was employable. Thus the testimony on this point by appellee's family doctor was uncontroverted.

## II

The majority reasons: that a "productivity factor" is "simply a substitute for inflation," majority opinion 243 Pa.Super. at 378, at 1274; that an inflation factor is not to be allowed in computing lost future earnings; and

---

2. The court's charge made it clear to the jury that the expert testimony was not binding on them and that they should themselves decide the extent of appellee's disability. *See* R. 654a, 656a–657a, 669a.

that therefore the productivity factor is likewise not to be allowed. I believe the first premise of this syllogism is incorrect.[3]

The economist testified:

> What I have taken into account here is the fact of productivity increases in the future, to try and allow for future increases in wages which would come about due to the fact that the economy over a long period of time has had a tendency to exhibit an increase in the propensity to produce goods and services at a faster more efficient rate. Namely, due to better technology. This, over the longrun [sic] is the principal cause or the principal reason why a person's wages rise; if he can produce twice as much in an hour after learning to do his job better, his employer can afford to pay him more because the employer has more goods that this individual produced that he can now offer for sale and, in fact, in the longrun [sic] in the American economy, productivity has increased or the ability of American workers to produce more goods and services in an hour somewhere around three and a half per cent, therefore, I have allowed the wage increase here approximately of about three and a half percent perannum [sic] for the remaining period of his work-life expectancy.

(R. 425a.)

This testimony suggests two reasons for a steady rise in productivity: "better technology," and a worker's "learning to do his job better." Neither of these is "inflation," which may be defined as "an increase in the volume of money and credit relative to available goods resulting in

---

**3.** I express no opinion on whether an inflation factor should be taken into consideration by a jury. I note, however, two points: (1) an increasing number of courts have allowed this, *see, e. g., Tenore v. Nu Car Carriers, Inc.,* 67 N.J. 466, 341 A.2d 613 (1975) and cases cited therein; (2) the cases cited by the majority, when read closely, do not strongly support the majority's conclusion.

a substantial and continuing rise in the general price level." Webster's Third International Dictionary (1965).[4]

The reasoning of some of the Pennsylvania cases implies that the use of a productivity factor in computing damages is proper although the factor is not discussed as such. The United States Court of Appeals for the Third Circuit said in *Magill v. Westinghouse Electric Corp.*, 464 F.2d 294 (3d Cir. 1972):

> "No Pennsylvania case . . . has been brought to our attention which would forbid the jury from considering future earning power in determining total future earnings prior to reducing them to present worth. To the contrary, Pennsylvania decisional law appears to make future *earning power* a proper subject for jury consideration when the administrator of the estate has introduced sufficient evidence to lay an adequate foundation for such deliberation."
> *Id.* at 300.

Our Supreme Court has held that "[t]he measure of a decedent's loss is what he 'would have probably earned by his intellectual or bodily labor in his business or profession during the residue of his lifetime.'" *Smail v. Flock*, 407 Pa. 148, 154, 180 A.2d 59, 61 (1962) (citation omitted.)

In my opinion, we should follow the implication of these cases and permit the use of a productivity factor, provided it is adequately supported. What appellee "would have probably earned" is more accurately estimated by including some consideration of increases in his

---

4. I express no opinion on whether there was an adequate foundation for the economist's testimony that the productivity factor was 3.5 per cent. He cited no studies, reports, or statistics regarding productivity, nor were any offered in evidence. If the question were correctly presented, I would be inclined to hold the foundation inadequate. Here, however, it is sufficient to note that appellant's counsel did not object to the foundation, but only to the use of the productivity factor on the ground that it was "inflation" in disguise.

income due to productivity factors, than by assuming that his income level would have remained fixed from the date he stopped working until the date of his retirement. To be sure, the estimate of resulting pay increases may be regarded as speculative; but it is even more speculative to assume no pay increases, because such an assumption is unrealistic.

A final comment: Without the productivity factor included in the calculations, appellee's lost future earnings would have been $156,878 (R. 443a); his lost past earnings were $16,926 (R. 443a); and his past medical bills exceeded $4,900 (appellee's brief at 30 [5] ). On these figures alone, the jury could have awarded appellee $178,714. In fact the verdict was $170,000. Accordingly, if the majority is correct, that the use of the productivity factor was error, the question arises whether the error was so serious as to require a new trial. It seems to me that the majority should respond to appellee's argument that the error was not that serious.

The judgment should be affirmed.

HOFFMAN and PRICE, JJ., join in this opinion.

---

[5]. Neither party has cited a reference to the medical bills on the record, nor does our own research reveal one. In his charge to the jury the judge said: "[W]e have a summary on these bills for you which we'll send out with you so you don't have to worry about how much the bills came to." (R. 652a.) Since appellant appears to admit medical specials of $4,964.38 (see appellant's brief at 42), I think it fair to adopt the figure of $4,900 in my discussion.