BRADSHAW, Donald; Cuneo, Alfred and Cuneo, Carole, Appellants, No. 79–1409,

v.

Bruce D. RAWLINGS, Gilbert D. Rawlings, Borough of Doylestown, Pennsylvania, Delaware Valley College, Marjorie E. Moyer, t/a Sunny Beverages, Maennerchor Society, Saab Motor Company, (four cases).

Appeal of BOROUGH OF DOYLES-
TOWN.  No. 79–1410

Appeal of DELAWARE VALLEY
COLLEGE.  No. 79–1411

Appeal of Marjorie MOYER t/a Sunny
Beverages.  No. 79–1412

Nos. 79–1409 to 79–1412.

United States Court of Appeals,
Third Circuit.

Argued Oct. 11, 1979.
Decided Dec. 17, 1979.

**136**

Louis Ruprecht (argued), Scotch Plains, N. J., for Donald Bradshaw, et al.

William F. Sullivan, Jr. (argued), Albert J. Schell, Jr., Post & Schell, Philadelphia, Pa., for Borough of Doylestown.

William T. Campbell, Jr. (argued), Swartz, Campbell & Detweiler, Philadelphia, Pa., for Delaware Valley College.

John W. Potkai (argued), Emil F. Toften, Emil F. Toften & Associates, Chalfont, Pa., for Marjorie E. Moyer T/A Sunny Beverages.

G. Thomas Miller, Harvey Freedenberg, McNees, Wallace & Nurick, Harrisburg, Pa., for amici curiae Pennsylvania Association of Colleges and Universities and American Council on Education; Sheldon Elliot Steinbach, Gen. Counsel, American Council on Education, Washington, D. C., of counsel.

Before ALDISERT and HUNTER, Circuit Judges, and MEANOR, District Judge.[*]

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question for decision in this diversity case tried under Pennsylvania law

---

[*] Honorable H. Curtis Meanor, of the United States District Court for the District of New Jersey, sitting by designation.

is whether a college may be subject to tort liability for injuries sustained by one of its students involved in an automobile accident when the driver of the car was a fellow student who had become intoxicated at a class picnic. Another question relates to the liability of the distributor who furnished beer for the picnic which led to the intoxication of the driver. Still another question concerns the tort liability of the municipality where the plaintiff's injuries occurred.

The district court permitted the question of negligence to go to the jury against the college, the beer distributor and the municipality. From an adverse verdict of $1,108,067 each of the defendants has appealed, advancing separate arguments for reversal. The plaintiff has filed a conditional cross-appeal.[1]

## I.

Donald Bradshaw, an eighteen year old student at Delaware Valley College, was severely injured on April 13, 1975 in Doylestown, Pennsylvania, while a backseat passenger in a Saab automobile driven by a fellow student, Bruce Rawlings.[2] Both were sophomores and had attended their class picnic at a grove owned by the Maennerchor Society on the outskirts of the borough.[3] Returning to the college from the picnic, Rawlings drove through Doylestown on Union Street. Union Street is colloquially known as "Dip Street" because it was constructed with drainage dips, instead of sewers, to carry surface water runoff. While proceeding through one of the dips, Rawlings lost control of the automobile which then struck a parked vehicle. As a result of the collision Bradshaw suffered a cervical fracture which caused quadriplegia.

The picnic, although not held on college grounds, was an annual activity of the sophomore class. A faculty member who

served as sophomore class advisor participated with the class officers in planning the picnic and co-signed a check for class funds that was later used to purchase beer. The advisor did not attend the picnic, nor did he get another faculty member to attend in his place. Flyers announcing the picnic were prominently displayed across the campus. They were mimeographed by the college duplicating facility and featured drawings of beer mugs. Approximately seventy-five students attended the picnic and consumed six or seven half-kegs of beer. The beer was ordered from Marjorie Moyer, trading as Sunny Beverages, by the sophomore class president who was underage.

The legal drinking age in Pennsylvania was, and is, twenty-one years, but the great majority of the students drinking at the picnic were sophomores of either nineteen or twenty years of age. Rawlings had been at the picnic for a number of hours. He testified that he had no recollection of what occurred from the time he left the picnic until after the accident. Bradshaw testified that Rawlings had been drinking and another witness, Warren Wylde, expressed his opinion that Rawlings was under the influence of alcohol when he left the picnic grove. That there was sufficient evidence on the question of Rawlings' intoxication to submit to the jury cannot be seriously questioned.

## II.

On appeal, the college argues that Bradshaw failed to present sufficient evidence to establish that it owed him a duty for the breach of which it could be held liable in tort. The district court, apparently assuming that such a duty existed, submitted the question of the college's liability to the jury, stating:

> In any event, the college owes a duty to use due care under the circumstances to

---

1. For convenience we refer to the plaintiff in the singular although joining the injured plaintiff, Donald Bradshaw, were his mother and stepfather who recovered $5,000 each.

2. Saab Motor Company, the manufacturer of the vehicle, and Gilbert Rawlings, the owner of

the vehicle, were originally named as defendants but plaintiff voluntarily dismissed them.

3. Although originally named as a defendant, the Maennerchor Society is not a party to this appeal.

prevent an unreasonable risk of harm to sophomores who attend a class function. Restatement (Second) of Torts §§ 282 and 283 (1965) provide:

§ 282. Negligence Defined

In the Restatement of this Subject, negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. It does not include conduct recklessly disregardful of an interest in others.

§ 283. Conduct of a Reasonable Man: The Standard

Unless the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances.

*Bradshaw v. Rawlings*, 464 F.Supp. 175, 181 (E.D.Pa.1979). In its post-trial opinion, the district court attempted to justify this instruction by stating:

I submitted this case to the jury on the above concept. The College was permitted to argue to the jury that it was not negligent because it was powerless to control the habits of college sophomores in regard to drinking beer. The jury rejected the College's defense that it acted in a reasonable manner under the circumstances. It should be noted that the College's liability is predicated on the concept of want of due care which a reasonable man would exercise under the circumstances.

*Id.*

### A.

■ The college's argument strikes at the heart of tort law because a negligence claim must fail if based on circumstances for which the law imposes no duty of care on the defendant. "Negligence in the air, so to speak, will not do." [4] As Professor Prosser has emphasized, the statement that there is or is not a duty begs the essential question, which is whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. " '[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." [5] Thus, we may perceive duty simply as an obligation to which the law will give recognition in order to require one person to conform to a particular standard of conduct with respect to another person.

These abstract descriptions of duty cannot be helpful, however, unless they are directly related to the competing individual, public, and social interests implicated in any case. An interest is a social fact, factor, or phenomenon existing independently of the law which is reflected by a claim, demand, or desire that people seek to satisfy and that has been recognized as socially valid by authoritative decision makers in society. [6] Certainly, the plaintiff in this case possessed an important interest in remaining free from bodily injury, and thus the law protects his right to recover compensation from those who negligently cause him injury. The college, on the other hand, has an interest in the nature of its relationship with its adult students, as well as an interest in avoiding responsibilities that it is incapable of performing.

### B.

■ Our beginning point is a recognition that the modern American college is not an insurer of the safety of its students. Whatever may have been its responsibility in an earlier era, the authoritarian role of today's college administrations has been notably diluted in recent decades. Trustees, administrators, and faculties have been required to yield to the expanding rights and privileges of their students. By constitutional amendment,[7] written [8] and unwritten law, and

4. F. Pollock, Law of Torts 468 (13th ed. 1929).

5. W. Prosser, Law of Torts 333 (3d ed. 1964).

6. *See, e. g.,* Pound, *A Survey of Social Interests,* 57 Harv.L.Rev. 1 (1943); Llewellyn, *A Realistic Jurisprudence—The Next Step,* 30 Colum.L.Rev. 431, 441–47 (1930).

7. Section one of the twenty-sixth amendment to the United States Constitution provides: "The right of citizens of the United States, who

through the evolution of new customs, rights formerly possessed by college administrations have been transferred to students. College students today are no longer minors; they are now regarded as adults in almost every phase of community life. For example except for purposes of purchasing alcoholic beverages, eighteen year old persons are considered adults by the Commonwealth of Pennsylvania. They may vote,[9] marry,[10] make a will,[11] qualify as a personal representative,[12] serve as a guardian of the estate of a minor,[13] wager at racetracks,[14] register as a public accountant,[15] practice veterinary medicine,[16] qualify as a practical nurse,[17] drive trucks, ambulances and other official fire vehicles,[18] perform general firefighting duties,[19] and qualify as a private detective.[20] Pennsylvania has set eighteen as the age at which criminal acts are no longer treated as those of a juvenile,[21] and eighteen year old students may waive their testimonial privilege protecting confidential statements to school personnel.[22] Moreover, a person may join the Pennsylvania militia at an even younger age than eighteen [23] and may hunt without adult supervision at age sixteen.[24] As a result of these and other similar developments in our socie-

ty, eighteen year old students are now identified with an expansive bundle of individual and social interests and possess discrete rights not held by college students from decades past. There was a time when college administrators and faculties assumed a role *in loco parentis.* Students were committed to their charge because the students were considered minors. A special relationship was created between college and student that imposed a duty on the college to exercise control over student conduct and, reciprocally, gave the students certain rights of protection by the college. The campus revolutions of the late sixties and early seventies were a direct attack by the students on rigid controls by the colleges and were an all-pervasive affirmative demand for more student rights.[25] In general, the students succeeded, peaceably and otherwise, in acquiring a new status at colleges throughout the country. These movements, taking place almost simultaneously with legislation and case law lowering the age of majority, produced fundamental changes in our society. A dramatic reapportionment of responsibilities and social interests of general security took place. Regulation by the college of student life on

are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."

8. *See, e. g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Papish v. Board of Curators,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) (per curiam); *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

9. 25 P.S. § 2811.

10. 48 P.S. §§ 1–5.

11. 20 Pa.C.S. § 2501.

12. 20 Pa.C.S. § 3156.

13. 20 Pa.C.S. § 5112.

14. 15 P.S. § 2621.

15. 63 P.S. § 9.8g.

16. 63 P.S. § 485.9.

17. 63 P.S. § 655.

18. 43 P.S. § 48.3.

19. *Id.*

20. 22 Pa.C.S. § 46.

21. 42 Pa.C.S. §§ 6302, 6303–08.

22. 42 Pa.C.S. § 5945.

23. 51 Pa.C.S. § 301 (seventeen years, six months).

24. 34 P.S. § 1311.316.

25. *See generally Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Healy v. James,* 408 U.S. 169, 171, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1971); *See also* Report of the President's Commission on Campus Unrest (1970); Report of the American Bar Association Commission on Campus Government and Student Dissent (1970); S. Kelman, Push Comes to Shove: The Escalation of Student Protest (1970); A. Adelson, SDS (4th ed. 1970).

and off campus has become limited. Adult students now demand and receive expanded rights of privacy in their college life including, for example, liberal, if not unlimited, partial visiting hours. College administrators no longer control the broad arena of general morals. At one time, exercising their rights and duties *in loco parentis*, colleges were able to impose strict regulations. But today students vigorously claim the right to define and regulate their own lives. Especially have they demanded and received satisfaction of their interest in self-assertion in both physical and mental activities, and have vindicated what may be called the interest in freedom of the individual will. In 1972 Justice Douglas summarized the change:

> Students—who, by reason of the Twenty-sixth Amendment, become eligible to vote when 18 years of age—are adults who are members of the college or university community. Their interests and concerns are often quite different from those of the faculty. They often have values, views, and ideologies that are at war with the ones which the college has traditionally espoused or indoctrinated.

*Healy v. James*, 408 U.S. 169, 197, 92 S.Ct. 2338, 2354, 33 L.Ed.2d 266 (1972) (Douglas, J., concurring).

Thus, for purposes of examining fundamental relationships that underlie tort liability, the competing interests of the student and of the institution of higher learning are much different today than they were in the past. At the risk of oversimplification, the change has occurred because society considers the modern college student an adult, not a child of tender years. It could be argued, although we need not decide here, that an educational institution possesses a different pattern of rights and responsibilities and retains more of the traditional custodial responsibilities when its students are all minors, as in an elementary school, or mostly minors, as in a high school. Under such circumstances, after weighing relevant competing interests, Pennsylvania might possibly impose on the institution certain duties of protection, for the breach of which a legal remedy would be available. *See, e. g., Chappel v. Franklin Pierce School District*, 71 Wash.2d 17, 426 P.2d 471 (1967); *McLeod v. Grant County School District*, 42 Wash.2d 316, 255 P.2d 360 (1953); Restatement (Second) of Torts § 320 (1965).[26] But here, because the circumstances show that the students have reached the age of majority and are capable of protecting their own self interests, we believe that the rule would be different.[27] We conclude, therefore, that in order to ascertain whether a specific duty of care extended from Delaware Valley College to its injured student, we must first identify and assess the competing individual and social interests associated with the parties.

### III.

#### A.

■ In the process of identifying the competing interests implicated in the student-college relationship, we note that the record in this case is not overly generous in

---

26. § 320. Duty of Person Having Custody of Another to Control Conduct of Third Persons

 One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

 (a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

 (b) knows or should know of the necessity and opportunity for exercising such control.

27. For example, Restatement (Second) of Torts § 315 (1965) states the general rule:

 There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

 (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

 (b) a special relation exists between the actor and the other which gives to the other a right to protection.

identifying the interests possessed by the student, although it was Bradshaw's burden to prove the existence of a duty owed him by the college in order to establish a breach thereof. Bradshaw has concentrated on the school regulation imposing sanctions on the use of alcohol by students. The regulation states: "Possession or consumption of alcohol or malt beverages on the property of the College or at any College sponsored or related affair off campus will result in disciplinary action. The same rule will apply to every student regardless of age." App. at 726a–727a. We are not impressed that this regulation, in and of itself, is sufficient to place the college in a custodial relationship with its students for purposes of imposing a duty of protection in this case. We assume that the average student arrives on campus at the age of seventeen or eighteen, and that most students are under twenty-one during the better part of their college careers. A college regulation that essentially tracks a state law and prohibits conduct that to students under twenty-one is already prohibited by state law does not, in our view, indicate that the college voluntarily assumed a custodial relationship with its students so as to make operative the provisions of § 320 of the Restatement (Second) of Torts. *See* footnote 26, *supra.*

Thus, we predict that the Pennsylvania courts would not hold that by promulgating this regulation the college had voluntarily taken custody of Bradshaw so as to deprive him of his normal power of self-protection or to subject him to association with persons likely to cause him harm. Absent proof of such a relationship, we do not believe that a prima facie case of custodial duty was established in order to submit the case to the jury on this theory.[28]

### B.

We next examine the facts adduced at trial to determine whether a special relationship existed as a matter of law, which would impose upon the college either a duty to control the conduct of a student operating a motor vehicle off campus or a duty to extend to a student a right of protection in transportation to and from off campus activities. We conclude that Bradshaw also failed to meet his burden of proving either of these duties. Bradshaw's primary argument is that the college had knowledge that its students would drink beer at the picnic, that this conduct violated a school regulation and state law, that it created a known probability of harm to third persons, and that knowledge by the college of this probable harm imposed a duty on the college either to control Rawling's conduct or to protect Bradshaw from possible harm.

Although we are aware of no Pennsylvania decision that has addressed this precise issue, the supreme court of that state has held that a private host who supplies intoxicants to a visibly intoxicated guest may not be held civilly liable for injuries to third parties caused by the intoxicated guest's negligence. *Manning v. Andy*, 454 Pa. 237, 310 A.2d 75 (1973). Only licensed persons engaged in the sale of intoxicants have been held civilly liable to injured parties, *id.* at 239, 310 A.2d at 76 (citing *Jardine v. Upper Darby Lodge*, 413 Pa. 626, 198 A.2d 550 (1964)), and the source of this liability derives from the common law, *Corcoran v. McNeal*, 400 Pa. 14, 161 A.2d 367 (1960), as well as from a violation of Pennsylvania's Dram Shop statute, 47 P.S. § 4–493(1), *Majors v. Brodhead Hotel*, 416 Pa. 265, 205 A.2d 873 (1965). Because the Pennsylvania Supreme Court has been unwilling to find a special relationship on which to predicate a duty between a private host and his visibly intoxicated guest, we predict that it would be even less willing to find such a relationship between a college and its student under the circumstances of this case.[29]

---

**28.** *See Hegel v. Langsam*, 29 Ohio Misc. 147, 273 N.E.2d 351, 55 Ohio Op.2d 476 (1971).

**29.** We read the earlier superior court decision of *Pennsylvania v. Randall*, 183 Pa.Super. 603, 133 A.2d 276 (1957), *cert. denied*, 355 U.S. 954,

78 S.Ct. 539, 2 L.Ed.2d 530 (1958), to be inconsistent with the supreme court's subsequent decision in *Manning v. Andy*, 454 Pa. 237, 310 A.2d 75 (1973). The superior court had interpreted "or other person" in the Dram Shop Act to mean persons other than licensees, their

The centerpiece of Bradshaw's argument is that beer-drinking by underage college students, in itself, creates the special relationship on which to predicate liability and, furthermore, that the college has both the opportunity and the means of exercising control over beer drinking by students at an off campus gathering. These contentions miss the mark, however, because they blur the distinction between establishing the existence of a duty and proving the breach thereof. Bradshaw does not argue that beer drinking is generally regarded as a harm-producing act, for it cannot be seriously controverted that a goodly number of citizens indulge in this activity. Our national public policy, insofar as it is reflected by industry standards or by government regulation of certain types of radio-television advertising, permits advertising of beer at all times of the day and night even though Congress has banned advertisement of cigarettes [30] and the broadcasting industry has agreed to ban the advertisement of liquor.[31] What we know as men and women we must not forget as judges, and this panel of judges is able to bear witness to the fact that beer drinking by college students is a common experience. That this is true is not to suggest that reality always comports with state law and college rules. It does not. But the Pennsylvania law that prohibits sales to, and purchases by, persons under twenty-one years of age, is certainly not a universal practice in other countries,[32] nor even the general rule in North America.[33] Moreover in New Jersey, the bordering state from which the majority of Delaware Valley College students come, App. at 744a–746a, the legal drinking age is eighteen. Under these circumstances, we think it would be placing an impossible burden on the college to impose a duty in this case.

Without explicating its rationale in detail, the state of New York has also refused to impose liability upon an institution of higher learning under somewhat similar circumstances. *See Mintz v. New York*, 47 A.D.2d 570, 362 N.Y.S.2d 619 (1975); *Rubtchinsky v. State University of New York*, 46 Misc.2d 679, 260 N.Y.S.2d 256 (1965); *Munson v. Board of Education*, 17

servants or employees. Using this interpretation, a private host could be held liable under the statute for serving minors. The supreme court's pronouncement in *Manning*, however, is diametrically opposed to that of the superior court: "Appellant asks us to impose civil liability on nonlicensed persons, like appellees, who furnish intoxicants for no remuneration. We decline to do so. While appellants' proposal may have merit, we feel that a decision of this monumental nature is best left to the legislature." 454 Pa. at 239, 310 A.2d at 76.

**30.** 15 U.S.C. § 1335.

**31.** National Association of Broadcasters, The Television Code 11 (19th ed. 1976); National Association of Broadcasters, The Radio Code 14 (20th ed. 1976).

**32.** For example, the legal age for drinking beer in Austria varies from state to state, ranging from fourteen to eighteen years; in Denmark, restaurants and hotels may not serve persons under eighteen; in England and Wales, a sixteen year old may purchase beer for consumption at a meal other than at a bar, otherwise the age requirement is eighteen; in France, minors less than sixteen years old may not enter bars unless accompanied by a parent or guardian, and must be eighteen in order to be served drinks stronger than beer or wine; in the Federal Republic of Germany, the legal age for drinking beer is sixteen and a juvenile over fourteen accompanied by an adult may buy or consume wine or beer in a public place; in Italy, the legal age is sixteen years; in the Netherlands, a hotel, restaurant or cafe may not sell beer to persons under sixteen but municipalities may prohibit by ordinance the sale to persons under twenty-one; in Norway, the legal age for drinking beer is eighteen, subject to the right of municipalities to impose tighter restrictions; in Sweden, the legal age is eighteen years; and in Switzerland, sixteen years. Legal Drinking Age in the United Kingdom and Continental Europe (November 1979) (Library of Congress Monograph, on file in the Library of the United States Court of Appeals for the Third Circuit, Pittsburgh Branch).

**33.** Of the fifty states and the District of Columbia only thirteen jurisdictions still retain the twenty-one year age requirement for the consumption of beer, while two require twenty years of age and nine, nineteen years. The remainder of the states permit beer drinking at age eighteen. Information, Please Almanac 822 (1979).

None of the Canadian provinces or territories retain the twenty-one year age minimum. Seven place the legal drinking age at nineteen, and five at eighteen. World Almanac 136 (1979).

A.D.2d 687, 230 N.Y.S.2d 919 (1962). *See also Perkins v. State Board of Education,* 364 So.2d 183 (La.App.1979).

Therefore, we conclude that Bradshaw failed to establish a prima facie case against the college that it should be charged with a duty of custodial care as a matter of law and that the district court erred by submitting the case to the jury.

## IV.

Marjorie Moyer, the licensee who sold the beer to the minor students, is liable for injuries proximately resulting therefrom, *Jardine v. Upper Darby Lodge,* 413 Pa. 626, 198 A.2d 550 (1964), unless she can demonstrate circumstances that remove her from the strictures of the general rule. She attempts to meet the task by arguing that there was insufficient evidence of Rawlings' intoxication to supply the causal link between the sale and the injury. Her argument must fail because, as we have previously concluded, there was sufficient evidence to submit the issue of the driver's intoxication to the jury. Witness Wylde testified that he, Rawlings, and Bradshaw were at the picnic all afternoon, were among the last to leave, and that in his opinion, Rawlings was "high." When directly asked whether Rawlings was under the influence of alcohol as he drove his car from the picnic grounds towards Union Street, Wylde answered that he was. App. at 98a. Also significant was Rawlings' testimony that although not seriously injured in the accident, he had no recollection of any of the events from sometime near the end of the picnic until after the collision occurred. We therefore conclude that no exception removed licensee Moyer from the Pennsylvania general rule imposing liability under the circumstances of this case, in which the beer was ordered by an under-aged member of the sophomore class for use at a sophomore class picnic. Although the delivery was signed for by a student of legal age, the beer distributor had reason to know that the great majority of drinkers who would consume the beer were under-aged.

## V.

The Borough of Doylestown argues that it should not be subject to liability because the negligence of Rawlings was a superseding cause as a matter of law. The district court ruled, however, that the question was a factual one and submitted it to the jury for resolution. This ruling was appropriate under the Pennsylvania law on superseding cause as set forth in *Estate of Flickinger v. Ritsky,* 452 Pa. 69, 75, 305 A.2d 40, 43 (1973):

It is easily seen that this statement of the law, like the rules controlling the question of what conduct is negligent presents *fact questions* of its own force. An intervening negligent act will not be a superseding cause relieving the original negligent actor from liability *if* that actor at the time of his negligent act *should have realized* that another person's negligence might cause harm; or, if a *reasonable man* would not regard the occurrence of the intervening negligence as *highly extraordinary*; or, if the intervening act is not *extraordinarily negligent.* What the original actor should have realized and what a reasonable man would say was highly extraordinary are, of course, fact questions which must in the majority of cases be left to the jury.

Doylestown further argues that any liability extending to it must be predicated on the theory that it was negligent in failing properly to warn of the existence of dips and that it cannot be held liable of this theory because there was proof that Rawlings had notice of the dips. This argument must also fail because failure to warn was only one of several alternative theories advanced by the plaintiff against the borough. Plaintiff argued and supplied sufficient evidence for the jury to find that Doylestown was negligent in creating and maintaining the dips, which presented an unreasonable risk of harm to the public. Evidence tended to show that simple culverts could have completely done away with the dangerous dips, that the borough failed to lower the speed limit on Union Street to a safer speed, and that it failed to place stop signs

at the preceding intersection as an alternative safety measure.

## VI.

■ Bradshaw's cross-appeal is conditioned on our granting a new trial in favor of the appellants. He asks this court not to apply the leading Pennsylvania appellate decision in *Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976), previously followed by this court in *Vizzini v. Ford Motor Co.*, 569 F.2d 754 (3d Cir. 1977), which holds that evidence of inflationary trends may not be introduced on damage awards. Because we are uncertain whether the cross-appeal is still being pressed in the face of our partial reversal of the district court's judgment, we meet this contention on the merits and conclude that the district court did not err. We rely on our statement in *Vizzini*, in which Chief Judge Seitz, writing for the court, stated:

> The Supreme Court of Pennsylvania has not yet considered whether or in what manner inflation or productivity increases may be accounted for in damage awards. . . . But we believe that a recent decision of the Pennsylvania Superior Court, *Havens v. Tonner* . . . is evidence of the thinking of the Pennsylvania courts on this point.
>
> In *Havens*, the Pennsylvania Superior Court held that evidence of increased productivity, was "simply a substitute for inflation and equally speculative and inadmissible in a calculation of future earnings," *id.* [243 Pa.Super.] at 378, 365 A.2d at 1274. The Court went on to say that
>
> > [a]ny estimate of future earnings over a substantial period of years based upon economic predictions is necessarily extremely speculative in nature. Much more satisfactory is evidence of the earning potential of the individual in question.
>
> 243 Pa.Super. at 380, 365 A.2d at 1275. Thus, evidence of increased productivity should not be admitted at a new trial.

569 F.2d at 768.

## VII.

The judgment of the district court will be affirmed in all respects except that part imposing liability against Delaware Valley College, which we reverse and direct that a judgment in favor of Delaware Valley College be entered. Accordingly, the judgment of the district court will be affirmed at Nos. 79–1409, 79–1410, and 79–1412; the judgment of the district court at No. 79–1411 will be reversed.